UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

RICKIE ALLEN KIRCHNER,                          Civ. No. 10-3263 (PAM/LIB)

            Plaintiff,

v.                                              **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,

Commissioner of the Social

Security Administration,

            Defendant.

## I.      INTRODUCTION

Pursuant to 42 U.S.C. § 405(g), Plaintiff Rickie Allen Kirchner ("Kirchner") seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB).  The parties have filed cross-motions for summary judgment, which have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons set forth below, this Court recommends that Plaintiff's motion be granted in part and denied in part and the case be remanded for further proceedings, and that the Commissioner's motion be denied.

## II.     PROCEDURAL HISTORY

Kirchner filed an application for DIB on June 27, 2006, alleging that he became disabled on October 20, 2004.  (T. 90-94).  He meets the insured status requirements

through September 30, 2011.  (T. 9).  Kirchner's application was denied initially on

October 18, 2006, and upon reconsideration on December 22, 2006.  (T. 53-57, 59-61).

Kirchner requested a hearing before an administrative law judge ("ALJ"), and the

hearing was held before ALJ David Gatto on October 29, 2008.  (T. 64, 14).  The ALJ

issued an unfavorable decision on February 26, 2009.  (T. 4-13).  Kirchner then filed a

request for review with the Appeals Council.  The Appeals Council denied his request

on June 4, 2010 (T. 1-3), thereby making the ALJ's decision the final decision of the

Commissioner for the purpose of judicial review.  See Grissom v. Barnhart, 416 F.3d

834, 836 (8th Cir. 2005).

## III.    FACTUAL BACKGROUND

### A.    Treatment Records

The earliest record is from November 26, 2001, several years before the alleged

onset date, when Kirchner underwent a sleep study at the Minnesota Regional Sleep

Disorders Center.  (T. 385-387).  Dr. Laurel Wills summarized the results.

> This is a markedly abnormal study due to sleep
> fragmentation induced by episodes of obstructive sleep
> apnea . . . associated with profound oxygen desaturation as
> low as 69%.  No slow wave nor REM sleep occurred during
> this portion of the study.  Consistent with the patient's dx of
> narcolepsy, he fell asleep one minute after lights out, and
> demonstrated a 92% sleep efficiency (time asleep for time in
> bed.)"

(T. 385).

The next record is dated March 6, 2002, when Kirchner saw Dr. John Stark at

Regions Hospital.  (T. 394).  Kirchner reported that he had back pain radiating down his

left leg, which he first experienced after a work injury.  (Id.)  He had tried cortisone

injections and anti-inflammatories but did not get relief.  (T. 394).   Upon physical examination, Kirchner was severely deconditioned, and his face severely drawn, which Dr. Stark related to chronic pain.  (Id.)  Kirchner was able to heel and toe walk, straight leg raise test was negative, and sensation was intact.  (Id.)  Dr. Stark advised Kirchner to return with all of his records and imaging.  (Id.)

Kirchner returned to Regions Hospital the next week.  (T. 392-93).  He reported his work injury occurred in August 2000.  (Id.)  Dr. Stark noted that Kirchner "appears to me to be a very motivated individual."  (Id.)  Kirchner completed a pain questionnaire, which indicated severe pain.  (Id.)  After reviewing Kirchner's imaging, Dr. Stark noted, "[s]urprisingly, the patient has a very modest dehydration of the disk spaces but he has a small punctate herniation of L5-S1 on the left which is catching the S1 nerve root.  He has no other changes which would explain his radiculopathy."  (Id.)  Dr. Stark's assessment was "herniated nucleus pulposus of S1 left with S1 radiculopathy."  (Id.)  Noting that Kirchner had tried conservative measures and that he had "classic radiculopathy-confirming signs," Dr. Stark recommended decompression.  (T. 393).  He noted that it was a modest operation.  (Id.)

Dr. Mark Stangers at Fairview Red Wing Health Services ("Fairview Redwing") completed a "Report of Work Ability" form for Kirchner on August 7, 2003.  (T. 389).  He noted that Kirchner had lumbar disc disease with chronic pain.  (Id.)  He opined that Kirchner could work an eight-hour shift with the following limitations:  sit, stand, walk, kneel, crouch, bend, twist, stoop, and reach above shoulders occasionally (2-4 hours a day), lift and carry 10-20 pounds occasionally, push and pull less than 50 pounds,

change positions as needed between sit, stand and walk.  (Id.)  Dr. Stangers completed

the same report with the same restrictions on April 8, 2004.  (T. 388).

On September 10, 2004, one month before the alleged onset date, Kirchner saw

Dr. John Goeppinger at Fairview Red Wing.  (T. 185).  Dr. Goeppinger noted that

Kirchner's level of alertness was unchanged as long as he took his medication.  (Id.)

He also noted that Kirchner had changes with his venous stasis dermatitis[1] in both legs,

and he had the condition for a long time.  (Id.)

Three months later, Dr. John Walsh at Fairview Red Wing noted that Kirchner's

sleep apnea was being treated with a CPAP with good success.  (T. 183).  But at the

end of the month, Kirchner told Dr. Louis Chen at the VA Medical Center that the

medication Adderall was not working for his narcolepsy, and he was falling asleep all

the time.  (T. 253).

Kirchner underwent a neurology consultation with Dr. Shelly Larson at the VA

Medical Center on March 15, 2005, and he requested a change in medication for

narcolepsy.  (T. 210).  Dr. Larson noted:

> the patient was diagnosed with idiopathic hypersomnia
> (narcolepsy) 15-20 years ago at the HCMC Sleep Center. At
> that time, it was thought that he had manic-depressive
> disorder secondary to his excessive daytime sleepiness.
> However, he had a sleep study performed, which showed
> that he was, in fact, narcoleptic." . . . "the patient was
> recently on Modafinil (at his request, per the patient) and
> realized that this was not an effective medication for him, as

---

[1]     "Stasis dermatitis occurs in patients with chronic venous insufficiency because pooled venous blood in the legs compromises the endothelial integrity in the microvasculature, resulting in fibrin leakage, local inflammation, and local cell necrosis."  The Merck Manuals Online Medical Library. http://www.merckmanuals.com/professional/sec10/ch114/ch114i.html

> he would consistently fall asleep throughout the day, despite receiving adequate sleep the night before.  He requests to be put back on Adderall . . . as he has been on this for an 8 year period in the recent past and found this to be the most effective medication for him and his daytime functioning.

(Id.)

On examination, Kirchner had no complaints of muscle pain or weakness.  (T. 211).  Nerve, motor and strength testing were normal.  (T. 212-14).  Dr. Larson told Kirchner to discontinue Modafinil, and she prescribed Adderall at a dosage and schedule that had worked best for Kirchner in the recent past (60mg per day).  (T. 214-15).  She encouraged Kirchner not to drive.  (T. 215).

Kirchner saw Dr. Chen for follow up on September 20, 2005.  (T. 236-38).  Dr. Chen noted that Kirchner's narcolepsy was "doing well," and Kirchner should continue using Adderall.  (T. 238).  When Kirchner returned on January 31, 2006, Kirchner had venous stasis dermatitis on both legs without infection.  (T. 228-29).  Dr. Chen's plan was to treat the dermatitis with a cream for one month, after which Kirchner would permanently need better hydration.  (T. 229).

Six months later, Kirchner called the VA Medical Center, on June 19, 2006, and reported that he bumped his leg against a chair and had arterial bleeding.  (T. 223-24).  Then, he noticed his legs swelling from the knees down, including his feet.  (T. 224).  He also admitted to dyspnea and chest tightness, but he declined to have a cardiac evaluation that day.  (Id.)

Kirchner followed up with Dr. Chen on July 6, 2006, and complained of recent skin wounds.  (T. 219-21).  Dr. Chen noted Kirchner had venous stasis dermatitis of the

5

legs with healed sores and edema.  (T. 221).  Dr. Chen told Kirchner he had many risk

factors for venous stasis, and he recommended losing weight and quitting tobacco use.

(T. 222).  He noted that Kirchner had a job as a security guard that required him to walk

seven miles, three times a week.  (Id.)  Dr. Chen recommended that Kirchner take a

short course of Lasix, and that he use compression stockings.  (Id.)  At that time,

Kirchner's narcolepsy was doing well.  (Id.)   About ten days later, Dr. Chen noted

Kirchner's narcolepsy continued to do well and the changes with his stasis dermatitis

were "gone with Lasix."  (T. 266).

Kirchner underwent a consultative physical examination with Dr. Ward Jankus on

October 4, 2006, at the request of the Social Security Administration.  (T. 256-58).

Kirchner reported chronic back pain, for which he was last treated one and a half years

ago.  (T. 256).  Kirchner said he was told he had to learn to live with it.  (Id.)  On the

average day, he would take four Tylenol for pain.  (Id.)  The pain was in his left lower

back, and shot down his left leg if he sat or stood still too long.  (Id.)  Upon examination,

Kirchner had some restricted range of motion in all planes of his back.  (T. 257).

On physical examination of Kirchner's legs, Dr. Jankus noted moderate venous

stasis changes with a few scrapes but "no major wounds or infection."  (T. 258).  Dr.

Jankus' diagnosis was chronic discogenic low back pain with previously documented

L5/S1 degenerative disc changes and intermittent left S1 nerve root irritation, and no

severe asymmetric radicular damage on exam "(no severe calf wasting, constant S1

sensory loss, straight leg raising, etc.)"  (Id.)  Dr. Jankus opined:

> Based on the straightforward demeanor and history provided
> today, I don't doubt at all that he does do much better if he is

> up walking and moving than just sitting or stuck standing in one spot, and currently, as noted above, he estimates out of an 8 hour period on a day off of work he is probably up 5 or 6 on his feet.  With his weight issues, plus his mechanical back pain issues, limited range, etc. I don't doubt at all that he would have significant difficulty doing any type of frequent or repetitive kneeling, squatting or crawling because of difficulty getting back up on his feet, and I don't doubt that he would have to have something nearby to be able to pull himself up on to get back up on his feet.

(Id.)

On October 12, 2006, Kirchner saw Dr. Larson in follow up for narcolepsy.  (T. 260).  Kirchner reported increased daytime somnolence and "wearing off effect" with his Adderall.  (Id.)  Dr. Larson discovered Kirchner was only taking half the dose he should have been taking, due to mistaken advice from a pharmacist.  (T. 262).  Kirchner's physical and mental status examinations were essentially normal that day.  (T. 261-62).  Dr. Chen recognized the mistake with the Adderall dose, and he ordered it to be doubled.  (T. 330).

State Agency Consultant Dr. George Salmi reviewed Kirchner's social security disability file and completed a Physical Residual Functional Capacity form regarding Kirchner on October 16, 2006, at the request of the Social Security Administration.  (T. 270-77).  He opined that Kirchner could lift and carry 25-50 pounds, stand or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  (T. 271).  Kirchner would also have the following postural limitations:  never climb ladders, ropes or scaffolds; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and avoid hazards, including professional driving.  (T. 272-74).  Dr. Salmi's opinion was affirmed by State Agency Consultant Dr. Dan Larson on December 12, 2006. (T. 283).

Kirchner saw Dr. Chen in April and May 2007.  (T. 296, 301, 327).   On both occasions, Kirchner's narcolepsy was doing well.  (T. 327).   Based on Kirchner's lab work, his diabetes was the best controlled it had been for two years.  (T. 296).   The changes to his stasis dermatitis were gone.  (T. 301).

In September 2007, Kirchner complained of burning pain in his feet from diabetic neuropathy.  (T. 295).   Podiatrist Dr. Eric Affeldt prescribed soft insoles for Kirchner's shoes.  (Id.)

Kirchner's next visit with Dr. Chen was on January 7, 2008. (T. 293).   Again, Kirchner's narcolepsy was doing well and he had no changes to his stasis dermatitis. (Id.)  Dr. Chen referred Kirchner to a social worker for financial issues.  (Id.)

Kirchner saw Social Worker Cynthia Hintz at the VA Medical Center the next day. (T. 287).   Kirchner reported that he worked as a night watchman for Red Wing Shoes on the weekends, and he walked approximately two miles each evening that he worked. (Id.)  This had helped his physical condition and improved his health.  (Id.)  Previously, he owned an archery shop, but it was no longer fiscally prudent because his landlord kept raising the rent.  (Id.)  Red Wing Shoes had offered him full-time employment, but the company's physician did not clear him for health reasons.  (Id.)  It appeared to Ms. Hintz that Kirchner would not qualify for a VA pension because he was over the income threshold.  (Id.)

## B.    Administrative Hearing

On October 29, 2008, Kirchner testified at a hearing before an administrative law judge.  (T. 18).   Kirchner testified as follows.  He graduated high school and has some

vocational training.  (Id.)  He was working part-time at a shoe factory for the last two years, approximately 28 hours every two weeks.  (Id.)  His schedule was to work two days one weekend, then three days the next weekend, as a security guard.  (Id.)  The job required walking around the plant, and his shift was from midnight to 6:00 a.m.  (T. 19).  Kirchner was only hired for the job because his father was his supervisor.  (T. 42).  Kirchner said he could not do a job that required sitting, even if it allowed him to stand up; because he has to be able to walk.  (Id.)

Kirchner is married.  (T. 22).  He spends much of his time with his nine grandchildren, one of whom he had custody.  (Id.)  He also gardens, takes his grandkids hunting, and watches his grandkids' sporting events.  (Id.)  He could not work because he could not find a job within his restrictions and with his medications.  (T. 23).  He cannot drive by himself because he falls asleep.  (Id.)  He has had narcolepsy for twenty years.  (Id.)  Adderall works best for him, but he still falls asleep during the day.  (T. 24).  He lost a job because he fell asleep at work.  (T. 24-25).

Kirchner owned an archery shop, which he opened approximately ten years before the hearing and closed about two years prior to the hearing.   (T. 31-32).  Kirchner worked at the store for 55-60 hours a week.  (T. 32).  The last six months before it closed, he worked 10-12 hours a week.  (Id.)  He last worked there full time in the first part of 2006.  (T. 34-35).

Kirchner also hurt his back while working as a mechanic.  (T. 25).  He had pain every day, and had to take 10-12 Tylenol a day to be able to stay on his feet.  (Id.)  Bending, lifting and prolonged sitting increased his pain.  (T. 26).  His feet also went

numb because he has diabetic neuropathy.  (T. 27).   Additionally, he has venous insufficiency in his legs, which he has had for at least ten years.  (T. 27-28).  He is treated for it with lotions, diabetic socks and orthopedic shoes.  (T. 29).

William Villa testified at the hearing as a Vocational Expert.  (T. 31).  The ALJ asked the VE about what type of employment a hypothetical person of Kirchner's age, education, work history, impairments and with the following limitations could perform: medium exertional level work with occasional stair climbing, stooping, kneeling, crouching and crawling, frequent balancing, no exposure to unprotected heights or dangerous machinery, and no professional driving.  (T. 35-36).  The VE testified such a person could not perform Kirchner's past relevant work as a bus mechanic but could perform the job of store manager.  (T. 36).  The VE testified that such a person could also perform light, unskilled small product assembler work, with 2,400 to 2,600 such jobs in Minnesota.  (T. 36-37).  And, the VE testified such a person could perform jobs of unskilled food packaging, with 3,300 to 3,500 such jobs in Minnesota, and light semi-skilled security jobs, with 8,800-9,000 such jobs in Minnesota.  (T. 37).

The ALJ then asked the VE another hypothetical question where lifting would be limited to 10-20 pounds occasionally and less than ten pounds frequently; standing and walking limited to a total of four out of eight hours a day; and sitting four out of eight hours a day, with the ability to change position at will for a brief period.  (T. 37-38).  The VE testified such a person could not perform Kirchner's past work but could perform the job of inspection of optical lenses, of which there are 900 to 1,100 such jobs in Minnesota, and surveillance system monitoring, of which there are 1,300-1,500 such jobs in Minnesota.  (T. 39).  The ALJ later added further restrictions to this hypothetical

question including occasional kneeling, crouching, stooping, twisting, bending and overhead reaching. (T. 41). The VE said this would not change his testimony about the type of jobs available under the third hypothetical question. (Id.)

For a final hypothetical question, the ALJ asked the VE whether a person who would be absent more than three days per month, was unable to maintain persistence and pace over a two-hour period due to narcolepsy, and would need unscheduled breaks including leaving the workplace without completing an eight-hour day could perform any work. (T. 39-40). The VE testified, "[n]one, whatsoever." (T. 40). The VE further testified that a person would not be employable if he fell asleep once an hour for five to ten minutes due to narcolepsy, and would also be unemployable if he fell asleep three times during his shift. (Id.)

###   C.    The ALJ's Decision

In concluding that Kirchner was not disabled, the ALJ followed the sequential, five-step process set forth in the Code of Federal Regulations. See 20 C.F.R. § 404.1520. Under the five-step sequential process, a claimant is disabled only if:  1) he or she is not presently engaged in substantial gainful activity; 2) he or she has a severe impairment that significantly limits his or her ability to perform basic work activities; 3) his or her impairment is presumptively disabling; 4) if his or her impairment is not presumptively disabling, the claimant cannot perform his or her past relevant work; and 5) if the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner to prove that there are other jobs that exist in significant numbers that

the claimant can perform. Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

At the first step, the ALJ found that Kirchner had not engaged in substantial gainful activity since the alleged onset date of October 20, 2004 because, although he worked, his earnings were below the level to be considered substantial gainful activity. (T. 9). At step two, the ALJ found that Kirchner has severe impairments of diabetes, obesity, sleep apnea, history of narcolepsy, degenerative disc disease and venous insufficiency. (T. 9). At step three of the disability evaluation, the ALJ considered, while taking Kirchner's obesity into consideration, whether Kirchner met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 10). The ALJ found that Kirchner did not meet or equal a musculoskeletal, respiratory or cardiovascular impairment under Listing Sections 1.00Q, 3.00I, and 4.00F. (Id.)

After reviewing the record, the ALJ found that Kirchner had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the additional restrictions of occasionally climb stairs and ramps, never climb ladders, occasionally stoop, kneel, crouch or crawl, never work with hazards including dangerous machinery and unprotected heights, and never perform professional driving. (T. 10). The ALJ found that the opinions of two state agency physicians were consistent with the record as a whole, so he placed significant weight on their opinions in arriving at the RFC. (Id.) Giving Kirchner some benefit of the doubt, the ALJ included greater restrictions than those of the state agency physicians. (T. 11).

In arriving at his RFC determination, the ALJ evaluated the credibility of Kirchner's subjective complaints.  (Id.)  The ALJ considered Kirchner's narcolepsy, and restricted Kirchner from driving or working around hazards, but did not further restrict Kirchner from work because Kirchner worked as a night watchman, and there was no evidence that sleep issues prevented him from doing the job.  (Id.)  The ALJ also found that Kirchner's daily activities were inconsistent with disability because he hiked in the woods, cared for his grandchildren, hunted, bowled and attended sporting events.  (Id.) He also noted that until Kirchner closed his shop, he spent a great deal of time, 55 to 60 hours a week, running an archery store.  (Id.)  The ALJ further noted that even when the business failed, Kirchner was still working ten to twelve hours a week.  (Id.)

The ALJ also considered Kirchner's use of medication.  (Id.)  He found that Kirchner received significant relief from his medications, including Adderall.  (Id.)  The ALJ also considered Kirchner's work history, and found that his part-time work as a watchman, which required walking two miles each evening, was inconsistent with disability.  (Id.)  Because Kirchner, a veteran, and his wife received disability benefits, the ALJ concluded Kirchner had income that permitted him to "stay out of the workforce." (T. 12.)

At the fourth step of the disability evaluation, the ALJ relied on the VE's testimony to conclude Kirchner could not perform his past relevant work as a bus mechanic.  (Id.) At the fifth step of the evaluation, the ALJ relied on the VE's testimony in response to a hypothetical question about the type of employment a person with Kirchner's age, education, work history, impairments and RFC could perform.  (Id.)  The ALJ concluded Kirchner could perform jobs such as small product assembly, food packaging, and

security guard that existed in significant numbers in Minnesota.  (Id.)  Thus, the ALJ concluded Kirchner was not under a disability as defined in the Social Security Act.  (Id.)

## IV.    STANDARD OF REVIEW

The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the record as a whole.  Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729 (8th Cir. 2003).  As the Court of Appeals has repeatedly stated, "the 'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard."  Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (quoting Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).

> 'Substantial evidence' is merely such 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' 'Substantial evidence on the record as a whole,' however, requires a more scrutinizing analysis.  In the review of an administrative decision, 'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)[internal citations omitted].

"Substantial evidence is 'less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision.'"  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006).  "In reviewing the Commissioner's decision, "we do not substitute our own view of the evidence for that of the Commissioner."   Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005)  It is immaterial whether the record supports a contrary result or whether we might decide the facts differently.  Id.  Therefore, "if, after reviewing

the record, we find that 'it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision' of the Commissioner." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995) (citation omitted)).

## V.    DISCUSSION

Kirchner raises four issues in support of his motion for summary judgment.  The Court will address Kirchner's arguments within the five-step framework of the disability evaluation.  Kirchner's first two arguments fall under step three of the evaluation process; whether Kirchner met or equaled Listing 1.04A for spinal disorder or Listing 4.11B for chronic venous insufficiency.  Kirchner's third argument falls under step four, whether the ALJ's residual functional capacity determination is supported by substantial evidence in the record, including whether the ALJ properly weighed the medical opinions.  Kirchner's fifth argument falls under step five of the evaluation process; whether Kirchner was disabled on his fiftieth birthday under Medical-Vocational Rule 201.10.

### A.    Whether Kirchner Met or Equaled Listing 1.04A

If a claimant has an impairment that meets the duration requirement and meets or equals a listed impairment in Appendix 1, the claimant will be found disabled without consideration of his or her age, education and work experience.  20 C.F.R. § 404.1520(d).  Listing 1.04A is for disorders of the spine, which includes herniated nucleus pulposus and degenerative disk disease, resulting in compromise of a nerve root or the spinal cord with:

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § 404, Subpart P, Appendix 1, §1.04A.  There is evidence in the record that Kirchner has a herniated disc and degenerative disk disease with compromise of the nerve root.  (T. 258, 392-93).  However, to meet the listing, there must also be evidence of nerve root compression characterized by neuro-anatomic distribution of pain accompanied by sensory or reflex loss and positive straight leg raise test.  See Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010) (evidence supported ALJ's conclusion that medical records did not show documented neurological loss required by the listing.) Kirchner did not have motor loss accompanied by sensory or reflex loss, and his straight leg raise test was negative.  (Tr. 211-14, 258, 394).  Therefore, he did not meet or equal Listing 1.04A.

### B.    Whether Kirchner Met or Medically Equaled Listing 4.11B

Kirchner also contends that he meets or equals Listing 4.11B.  Listing 4.11B is for chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system and superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least three months of prescribed treatment.   20 C.F.R. § 404, Appendix 1, Subpart P, § 4.11.  In this context, recurrent means "that the longitudinal clinical record shows that, within a consecutive 12-month period, the finding occurs at least three times, with intervening periods of improvement of sufficient duration that it is clear that separate events are

16

involved."   20 C.F.R. § 404, Appendix 1, Subpart P, § 4.00(A)(3)(c).  Persistent means "that the longitudinal clinical record shows that, with few exceptions, the required finding(s) has been present, or is expected to be present, for a continuous period of at least 12 months, such that a pattern of continuing severity is established."   20 C.F.R. § 404, Appendix 1, Subpart P, § 4.00(A)(3)(b).

Kirchner had chronic venous insufficiency and stasis dermatitis during the relevant time period.   To meet or equal the listing, there must also be evidence that Kirchner had either recurrent ulceration or a persistent ulceration that had not healed following three months of prescribed treatment.   The record is not clear in this regard.

Plaintiff's alleged onset date is October 4, 2004, and on September 10, 2004, Dr. John Goeppinger noted that Kirchner had "changes with venous stasis dermatitis in both legs.   There for a long time."   (T. 185).   The "changes"[2] could have been ulcerations, and if they were "there for a long time," they could have been "recurrent" or "persistent" as defined under the regulations.   The next medical record that addresses Kirchner's stasis dermatitis is from January 2006, and it indicated "changes" to stasis dermatitis which required treatment with a cream.  (Tr. 229).   In July 2006, Kirchner had venous stasis "changes" with healed sores and edema.   (Tr. 222).   Dr. Chen noted Kirchner's many risk factors for venous stasis and prescribed Lasix and compression stockings.   (Id.)   The Lasix was very effective, and for the most part cleared up the "changes" with Kirchner's stasis dermatitis.   (T. 266, 293, 301).   However, in October 2006, Dr. Jankus noted "moderate venous stasis changes with a few scrapes."   (T.

---

[2]        "When chronic venous insufficiency and stasis dermatitis are both inadequately treated, stasis dermatitis progresses to frank skin ulceration, chronic edema, thickened fibrotic skin, or lipodermatosclerosis."   The Merck Manuals Online Medical Library.
http://www.merckmanuals.com/professional/sec10/ch114/ch114i.html

258).  The longitudinal record includes some evidence to suggest Kirchner may have met or equaled the listing, at least for a closed period.

Here, the ALJ did not give any explanation for his determination that Kirchner did not meet or equal listing 4.11B.  (T.10).  On this record, because it is unclear whether the "changes" to Kirchner's stasis dermatitis were ulcerations, the Court cannot determine whether substantial evidence on the record as a whole supported the ALJ's determination.  There is a gap in the record from September 10, 2004, when Dr. Goeppinger noted that Kirchner had changes with stasis dermatitis that were there for a long time, and the next record in January 2006, where the "changes" of his stasis dermatitis required treatment.  The ALJ has a duty to develop the record.  See Scott ex rel. Scott v. Astrue, 529 F.3d 818, 824 (8th Cir. 2008) ("Due to inconsistencies in the record, which the ALJ failed to address, we are unable to determine whether substantial evidence supports the ALJ's finding that [claimant's] impairment did not meet or medically equal [a listing].")   Therefore, the case should be remanded for the ALJ to obtain medical testimony and/or additional medical records sufficient for the ALJ to determine and explain whether or not Kirchner meets or medically equals Listing 4.11B, including whether he met the listing for a closed period.  The Court will address Kirchner's additional arguments to determine whether there are any other issues for remand.

**C.      Whether the ALJ Erred in his Residual Functional Capacity Determination**

Assuming for the moment that Kirchner does not meet or equal Listing 4.11B, Kirchner contends the ALJ erred in weighing the medical opinions and placing more weight on the opinions of non-examining state agency physicians than on those of his treating physicians.   The Commissioner contends that none of Kirchner's treating physicians gave an opinion regarding Kirchner's residual functional capacity.   The Commissioner is correct to the extent that no treating physician opined as to Kirchner's residual functional capacity during the relevant time period.[3]   Kirchner's treating physicians commented on Kirchner's impairments but did not opine as to his work restrictions resulting from his impairments.

However, the Court notes that Dr. Ward Jankus, the D.D.S. physician who examined Kirchner, stated:  "I don't doubt at all that he does do much better if he is up walking and moving than just sitting or stuck standing in one spot. . ."  (Tr. 258). Kirchner testified that he must be up walking; and he could not do a job that only allowed him to sit or stand as needed.  (T. 42).  Kirchner has two conditions that may require him to keep walking, his low back pain and his narcolepsy.  Dr. Jankus believed that Kirchner needed to be up walking, and the ALJ erred by not discussing why he disagreed with Dr. Jankus' assessment.  See Heino v. Astrue, 578 F.3d 873, 879 (8th

---

[3]      In April 2004, before the alleged onset date, Dr. Mark Stangars opined as to Kirchner's work restrictions related to his back impairment.  (T. 388).  However, the ALJ incorporated these restrictions into a hypothetical question to the vocational expert, who testified there were jobs a person with such restrictions could perform that existed in significant numbers in the State of Minnesota.  (T. 39, 41.) Because Dr. Stangars' opinion does not support disability, the Court need not address the weight the ALJ gave his opinion.  Additionally, the Court notes that Kirchner's ability to walk six hours a day in his part-time employment is inconsistent with Dr. Stangers' opinion of a four- hour walking limitation.

Cir. 2009) (the ALJ considers the medical opinions and "must resolve conflicts among the various opinions.")  None of the hypothetical questions the ALJ posed to the VE included a requirement that Kirchner must be able to walk for an eight-hour shift, as opposed to sitting or standing in one place at will.  The fact that Kirchner works part-time in a job where he walks six hours a day, two or three days a week, is not inconsistent with Kirchner's testimony that he requires a job that would allow him to keep walking.  (T. 42).

Kirchner additionally argues that substantial evidence in the record supports a finding that he does not have an ability to work on a regular and continuing basis, as required for full-time competitive employment.  He cites his inability to stay awake and the results of his sleep study.  He cites the records from Dr. John Stark.  He also cites the fact that he can only hold his part-time job because his father is his supervisor.

Nothing in the record explains why Kirchner could not hold a full-time job that allows him to walk, as his part-time job does.  There is nothing in the record to suggest that he does not stay awake in his part-time job.  And, there is nothing in the record that suggests he cannot work for eight hours a day, five days a week in a job that would allow him to remain walking.  Kirchner testified that he tried to find full-time security guard work but no one would hire him.  (Tr. 42).  Under the regulations, it does not matter if (1) work exists in the immediate area where the claimant lives; (2) a specific job vacancy exists for the claimant; and (3) the claimant would [or would not] be hired if he or she applied for work.  20 C.F.R. § 404.1566.

Kirchner told Social Worker Cynthia Hintz that Red Wing Shoes offered him a full-time job, but their physician did not approve him for full-time work.  (T. 287).  There is no evidence in the record of this physician's opinion or the reasons for it.  For these reasons, the Court rejects Kirchner's argument that the ALJ should have found him unable to work on a regular and continuing basis.

**D.      Whether Kirchner Was Disabled Under Medical-Vocational Rule 201.10 as of His Fiftieth Birthday.**

Once again assuming that Kirchner does not meet or medically equal Listing 4.11B, the ALJ had to proceed to the fifth step of the evaluation process because he found at step four of the evaluation that Kirchner could not perform his past relevant work.  Kirchner argues, under step five of the evaluation process, that he is disabled under Medical-Vocational Rule 201.10.

20 C.F.R. § 404, Subpart P, Appendix 2, Rule 201.10 provides that a person who is closely approaching advanced age, with limited or less education, and skilled or semi-skilled work history without transferable skills is disabled.  Rule 201 applies to persons who are limited to sedentary work as a result of severe medically determinable impairments.   Closely approaching advanced age is defined as 50-54 years-old.  20 C.F.R. § 404.1563(d).  Limited education is generally considered 7th grade through 11th grade of formal education.  20 C.F.R. § 404.1564(b)(3).  For the reasons discussed below, even if Kirchner were restricted to sedentary activities; he does not fall under Rule 201.10.  First, the Court notes that Kirchner's testimony that he must be up and walking and not sitting or standing in one place is inconsistent with sedentary work.

See 20 C.F.R. § 404.1567(a) ("[a]lthough a sedentary job is defined as one which involves sitting. . . [j]obs are sedentary if walking and standing are required occasionally."

Second, Kirchner does not have a limited education because he completed high school and attended vocational school.  (T. 130-31).  Third, according to the VE's report, Kirchner's past work as a bus mechanic was skilled; and he has transferable skills of using hand and power tools, using repair manuals, and knowledge of bus repair. (T. 174).  Thus, even assuming a sedentary RFC, Kirchner would fall under Rule 201.15 (closely approaching advanced age, high school graduate or more, skilled or semiskilled work history with transferable skills), which directs a finding of not disabled.

## VI.    CONCLUSION

In summary, substantial evidence in the record supports the ALJ's finding that Kirchner did not meet or equal Listing 1.04A for spinal disorders.  However, the ALJ failed to explain his determination that Kirchner did not meet or equal Listing 4.11B for chronic venous insufficiency, and there is evidence in the record to suggest Kirchner may have met or equaled the listed impairment.  Remand is required for the ALJ to obtain medical testimony and/or additional medical records sufficient for the ALJ to determine and explain whether or not Kirchner meets or medically equals Listing 4.11B, including whether he met the listing for a closed period.

The ALJ also erred by not discussing the opinion of the consultative examiner, Dr. Ward Jankus, who opined that Plaintiff would "do better" if he was up walking and not sitting or standing in one place.  None of the hypothetical questions the ALJ posed

to the VE encompassed this restriction, and the ALJ did not explain why he rejected it. This restriction is consistent with how Kirchner performs his part-time work, and with his daily activities. If Kirchner does not meet or equal Listing 4.11B after further development of the record, the ALJ must address Dr. Jankus' opinion.

The Court rejects Kirchner's argument that substantial evidence in the record indicates that he cannot work on a regular and continuing basis. Again, this is only relevant if Kirchner does not meet or equal Listing 4.11B. Finally, Medical Vocational Rule 201.10 does not apply to Kirchner, and the Court rejects his argument that he was disabled under this rule as of his fiftieth birthday.

Based on the foregoing and all of the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.     Plaintiff's Motion for Summary Judgment [Docket No. 10] be GRANTED in part and DENIED in part; and

2.     Defendant's Motion for Summary Judgment [Docket No. 13] be DENIED;

3.     The case be remanded pursuant to sentence 4 of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation;

4.     If this Report and Recommendation is adopted, that Judgment be entered accordingly.

Dated:  June 1, 2011                          s/Leo I. Brisbios
                                              LEO I. BRISBOIS
                                              United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2, any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 15, 2011**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection.   A party may respond to the objections within fourteen days of service thereof.   Written submissions by any party shall comply with the applicable work limitations provided for in the Local Rules.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.